Roy WALKER and Shellie
Walker, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 04–155L.

United States Court of Federal Claims.

May 31, 2005.

Lyman Daniel Bedford, McQuaid, Bedford & Van Zandt, L.L.P., San Francisco, CA, for plaintiffs.

Kristine Sears Tardiff, United States Department of Justice, Washington DC, for defendant.

## MEMORANDUM OPINION AND ORDER

BRADEN, Judge.

### RELEVANT FACTS [1]

Plaintiffs Roy and Shellie Walker own and raise cattle on the Walker Ranch in Grant

---

1. The relevant facts recited herein were derived from: the February 5, 2004 Complaint ("Compl."); the Government's May 4, 2004 Motion to Dismiss ("Gov't Mot. to Dismiss") and exhibits thereto ("Def.Ex."); Plaintiff's August 16, 2004 Opposition ("Pl.Opp."); an August 16, 2004 Declaration of Ms. Shellie Walker ("Walker

County, New Mexico. *See* Walker Decl. ¶ 27; *see also* Compl. ¶¶ 4, 12–13. The Walker Ranch consists of 40 acres of land that is the base property[2] for two grazing allotments[3] in the Gila National Forest administered by the United States Forest Service ("U.S. Forest Service").[4] *See* Compl. ¶¶ 8–9. The Walkers purchased the base property and rights to the Hot Springs and Cold Springs Allotments (hereinafter collectively "allotments") in two separate transactions. On September 26, 1994, the Walkers purchased 160 acres of land from Louis and Myrtle Oliver, together with a U.S. Forest Service grazing permit[5] issued September 10, 1985 "allowing [the Walkers] to graze 160 head of mother cows year long on [the Cold Springs Allotment]." Walker Decl. ¶ 7; Walker Decl. Ex. F; *see also* Compl. ¶¶ 8–9. On September 26, 1994, the Walkers also sold the 160 acres back to Louis and Myrtle Oliver, but retained the grazing permit and the rights to use the Cold Springs Allotment. *See* Walker Decl. ¶ 8. Subsequently, on December 28, 1994, the Walkers purchased 40 acres of land and the Hot Springs Allotment from Crecencio and Neline Dominguez.[6] *See* Walker Decl. Ex. A; *see also* Compl. ¶ 8. As a result of these two transactions, the Walkers contend that they obtained all water, range, forage, and access rights, as well as the range improvements, on the allotments. *See* Walker Decl. ¶¶ 21–23; *see also* Walker Decl. Ex. A–B, E–G; Compl. ¶¶ 8, 10. The Walker Ranch used water from the allotments as part of cattle operations. *See* Walker Decl. ¶¶ 28–29.

On March 23, 1995, the U.S. Forest Service issued the Walkers a Ten Year Term Grazing Permit, No. 06–1099 ("grazing permit") that allowed year-long grazing of 265 head of cattle and eight horses on the Hot Springs and Cold Springs Allotments covering approximately 17,826 acres within the Gila National Forest.[7] *See* Walker Decl. ¶ 30; *see also* Def. Ex. 1 (grazing permit); Def. Ex. 2 (Declaration of District Ranger Gerald Engel ("Engel Decl.")) ¶ 6. On April 30, 1996, in response to complaints about dead and sick cattle on the allotments, the U.S. Forest Service inspected the allotments. *See* Def. Ex. 3–4. On May 13, 1996, the U.S. Forest Service conducted a second inspection to confirm that grass on the allotments had been decimated by overgrazing and drought conditions. *See* Def. Ex. 4 at 18. Mike Head, the Range Conservationist who conducted the inspections, suggested that the "Boundary and Hot Springs pastures be rested 12 months [to allow] the grass plants, [forage] and riparian species a chance to recover from the heavy grazing and droughth [sic] conditions that have existed [in 1996]." *Id.*

On May 14, 1996, District Ranger Engel convened a meeting with Roy Walker, Wade Kemp, Manager of the Walker Ranch, Mike Head, and officials from the New Mexico Environment Department, to discuss the drought-related problems on the allotments. *See* Def. Ex. 5. On May 16, 1996, District Ranger Engel wrote a letter to Roy Walker

Decl."); and the Government's August 18, 2004 Reply ("Gov't Reply").

2. "Base property" is "land and improvements owned and used by the permittee for a farm or ranch operation and specifically designated by him to qualify for a term grazing permit." 36 C.F.R. § 222.1(b)(3).

3. An allotment is a "designated area of land available for livestock grazing." 36 C.F.R. § 222.1(b)(1).

4. The Chief of the U.S. Forest Service will "develop, administer and protect the range resources and permit and regulate the grazing use of all kinds and classes of livestock on all National Forest System lands and on other lands under Forest Service control." 36 C.F.R. § 222.1(a).

5. A U.S. Forest Service grazing permit is "any document authorizing livestock to use National Forest System or other lands under Forest Service control for the purpose of livestock production including … 'term permits' for up to 10 years with priority for renewal at the end of the term." 36 C.F.R. § 222.1(b)(5).

6. The Walkers also obtained a permit to graze livestock on the Hot Springs Allotment in the purchase from the Dominguezes, however, neither this grazing permit nor the permit purchased in the Oliver transaction are part of the record in this case. *See* Def. Ex. 1.

7. Permit No. 06–1099 superceded the grazing permits the Walkers purchased from the Olivers and the Dominguezes. *See* Def. Ex. 1 (grazing permit).

that instructed him first to remove sick cattle from canyon bottoms and then begin removing all livestock to allow the allotments to recover:

> As we discussed, you need to take immediate action to start gathering and removing the cattle that are hanging in the bottoms. I know this will be a tough chore since these animals are very weak and in poor condition, but I don't feel you have any choice but to start removing livestock from the allotment.

> \*　　\*　　\*　　\*　　\*　　\*

> From what I have seen on two recent inspection rides on your allotment, it is highly probable that you will end up totally removing all livestock from the allotment before the end of the summer. I know that these are extreme measures that I am instructing you to take, but conditions are such that there is only enough feed and water left on the allotment to support a very limited number of animals.

> \*　　\*　　\*　　\*　　\*　　\*

> [I] see no other alternative but for you to immediately start whatever action you feel is appropriate to facilitate the removal of livestock from the allotment and start gathering and removing your cattle, especially the ones in very poor condition.

Def. Ex. 6 at 21.

At a June 21, 1996 meeting, District Ranger Engel again advised Roy Walker that additional cattle needed to be removed from the pastures in order to let the grazing areas recover, even though the herd had been reduced from 265 to 190. *See* Def. Ex. 7 at 23; *see also* Def. Ex. 9 at 26. District Ranger Engel and Roy Walker agreed to "ride the allotment together very soon to look at management options." Def. Ex. 7 at 23. Instead, on July 3, 1996, Roy Walker advised District Ranger Engel that he could not accompany him on the inspection. *See* Def. Ex. 8 at 24–25. And, on July 8, 1996, District Ranger Engel received a letter from Roy Walker declaring:

> I am the owner of the allotment(s) and your only authority over the surface estate is derived from my having entered into a cooperative grazing agreement (known as

a grazing permit) with the Forest Service. Under the Acts of July 26, 1866, and May 10, 1872, Congress "confirmed" and "sanctioned" my predecessor's possessory right to the surface estate of my ranch. Thereafter, the only authority the United States had over my ranch was the power of "survey". After the Cold and Hot Springs Allotments were surveyed, or the boundaries defined, my "title" to the surface estate became perfect. It is only because of the existence of the cooperative grazing "permit" agreement presently in force that the Forest Service has any say whatsoever over my allotments. If you persist in your ridiculous demands that I reduce my cattle numbers ... then YOU will have broken the original permit agreement, and that agreement will be void and of no force and effect. Additionally, I am putting you on notice that I am canceling the permit agreement because of your continuous harassment aimed at trying to financially destroy my property interest in my ranch "allotments." The one thing you say in your letter of July 1, 1996 that I agree with is that "this reduction in numbers will put a financial burden" on me. In fact, I will take that statement as a clear admission on your part that a reduction of my cattle numbers to 100 head will be a regulatory taking of my entire ranch against my will. If you persist in your efforts to force me to remove any more cattle from my ranch I will bring legal action to recover money damages in the U.S. Court of Claims.

Def. Ex. 9 at 26 (emphasis in original).

On July 23, 1996, District Ranger Engel responded. *See* Def. Ex. 10 at 28–29. On August 5, 1996, Roy Walker again claimed ownership of all surface rights on the allotments and characterized the permit as a "cooperative agreement:"

> It is true we voluntarily entered into a "cooperative agreement" with the Forest Service after we purchased our "allotments." You call this cooperative agreement a "permit." There is nothing in the language of the "permit" agreement that prevents us from canceling the agreement.... [Y]ou have violated and voided

our cooperative agreement, therefore, we are informing you that we are no longer interested in participating in your "cooperative programs" as authorized by the National Forest Management Act, so if your action has not voided the agreement entirely, then we are putting you on notice that ... we are canceling the permit effective on the date of your order to remove and reduce our livestock numbers down to 100 head[.]

Def. Ex. 11 at 31.

On August 20, 1996, District Ranger Engel instructed the Walkers to reduce the number of cattle grazing on the allotments to no more than 100. *See* Def. Ex. 12 at 34. The Walkers also were advised that failure to comply would result in suspension and/or cancellation of the March 23, 1995 grazing permit and ordered to show cause by August 31, 1996, why the grazing permit should not be revoked. *Id.* at 35. On August 30, 1996, Roy Walker again responded, asserting that the grazing permit was a "cooperative agreement." *Id.* at 36.

On September 10, 1996, District Ranger Engel suspended the Walkers' right to graze 165 head of livestock on the allotments. *See* Def. Ex. 13 at 37. The Walkers were given until September 30, 1996, to reduce grazing livestock on the allotments to 100. *Id.* On September 10, 1996, the Walkers also received a second bill for the collection of grazing fees for the second half of 1996.[8] *See* Def. Ex. 14 at 42. Payment was due October 1, 1996. *Id.* The Walkers failed to pay on that date. *See* Def. Ex. 17 at 51.

On October 4, 1996, Permit No. 06–1099 was cancelled in part. *See* Def. Ex. 15 at 47–48. On October 29, 1996, Roy Walker responded by letter, again asserting that the Walkers owned all surface rights on the allotments and were not required to have a permit to graze cattle thereon. *See* Def. Ex. 16 at 50.

On November 8, 1996, Permit No. 06–1099 was cancelled in its entirely and the Walkers were directed to remove all remaining live-

stock from the allotments. *See* Def. Ex. 17 at 51; *see also* Def. Ex. 2 (Engel Decl.) ¶ 14; Walker Decl. ¶ 31. The Walkers did not file an administrative appeal. *See* Def. Ex. 2 (Engel Decl.) ¶ 15. Instead, the Walkers continued to assert that they owned the allotments and were not required to have a permit to graze their cattle. *See* Def. Ex. 18 at 55; *see also* Walker Decl. ¶ 31. After the permit was cancelled, the Walkers continued to graze 265 head of cattle on the allotments until June 30, 1998. *See* Walker Decl. ¶¶ 31–32; *see also* Def. Ex. 2 (Engel Decl.) ¶ 16.

## PROCEDURAL BACKGROUND

### A. The Government's 1997 Action In The United States District Court For The District Of New Mexico.

On May 7, 1997, the United States ("the Government") filed a Complaint in the United States District Court for the District of New Mexico ("United States District Court") to recover damages to the grazing area caused by the Walkers' trespass on the allotments after the grazing permit was cancelled. In addition, the Government asked to recover unpaid grazing fees and obtain an injunction to prohibit the Walkers from continuing to graze livestock on the allotments and require the removal of any remaining livestock. *See United States v. Roy Dee Walker and Shellie Ann Walker,* No. Civ. 97–641 (D.N.M. filed May 7, 1996) ("United States District Court action"); *see also* Def. Ex. 19 ¶¶ 1–6; Walker Decl. ¶ 33.

On June 9, 1997, the Walkers filed an Answer asserting ownership of all surface rights on the allotments and a Counterclaim for Just Compensation under the Fifth Amendment to the United States Constitution. *See* Def. Ex. 20 at 78–80; *see also* Walker Decl. ¶ 34. On August 26, 1997, the Government filed a Motion to Dismiss the Counterclaim. *See* Def. Ex. 21 at 83. On October 7, 1997, the Walkers also filed a Motion to Dismiss. *Id.* On October 8, 1997, the Government filed a Motion for Summary Judgment. *Id.* During the United States District Court proceeding, the Walkers con-

---

8. On July 29, 1996, District Ranger Engel sent an initial bill for grazing fees for the second half of 1996. *See* Def. Ex. 14 at 40–41. The Walkers

failed to pay that bill on the due date of September 1, 1996. *Id.* at 42.

tinued to graze 265 head of cattle on the allotments. *See* Walker Decl. ¶¶ 30, 32, 37.

On January 7, 1998, the United States District Court issued a Memorandum Opinion and Order denying the Walkers' Motion to Dismiss; dismissing the Walker's Counterclaim, without prejudice; and granting the Government's Motion for Summary Judgment. *See United States v. Roy Dee Walker and Shellie Ann Walker*, No. Civ. 97–641, slip op. at 6–7 (D.N.M. Jan. 7, 1998) ("Def. Ex. 21"). Therein, the United States District Court held:

> There is no legal basis for [the Walkers'] argument that they hold title to the "surface estate" of the Cold/Hot Springs allotment. I find that the [Walkers] have no legal title to the Cold/Hot Springs allotment and that their continued grazing of cattle upon the Cold/Hot Springs allotment within the Gila National Forest without a permit constitutes a trespass.

Def. Ex. 21 at 87.

With respect to the Walkers' Counterclaim, the United States District Court determined that:

> [the Walkers' counterclaim must be] heard in the [United States] Court of Federal Claims [because it] seeks damages in excess of $670,500.00 plus other unenumerated economic losses as well as injunctive relief against [the Government]. Because this far exceeds the amount stated in the Tucker Act, this Court has no jurisdiction ... unless [the Walkers] stipulate that their claims will not exceed $10,000.

*Id.* at 88 (citations omitted).

On February 27, 1998, a Final Judgment was issued by the United States District Court denying the Walkers' Motion to Dismiss; dismissing the Walkers' Counterclaim, without prejudice; granting the Government's Motion for Summary Judgment; en-

joining the Walkers from grazing cattle without a permit; and requiring the Walkers to remove all livestock from the allotments no later than June 30, 1998. *See* Def. Ex. 22 at 90–91; *see also* Walker Decl. ¶ 38. The Walkers also were assessed $13,411.84 for unlawful grazing. *See* Def. Ex. 22 at 90–91. The Final Judgment, however, emphasized that: "[n]othing herein will be deemed a waiver of [the Walkers'] right to appeal this final judgment as to the liability for trespass, or to file a takings claim in the [United States] Court of Federal Claims with respect to the facts underlying this trespass action." *Id.* at 91. The Walkers, however, did not appeal the Final Judgment and removed all livestock from the allotments by the June 30, 1998 deadline. *See* Walker Decl. ¶ 39.

**B. Proceedings In The United States Court Of Federal Claims.**

On February 5, 2004, the Walkers filed a Complaint in the United States Court of Federal Claims. The case was assigned to the Honorable Diane G. Sypolt. The Complaint asserts a violation of the Just Compensation Clause of the Fifth Amendment to the United States Constitution and a claim for compensation pursuant to 43 U.S.C. § 1752(g).[9] *See* Compl. ¶¶ 1–38.

The Just Compensation claim alleged a taking of: water rights on the allotments through physical appropriation of the water and a denial of all economic uses of the water, including a deprivation of all reasonable, investment-backed expectations (*see* Compl. ¶ 32); the Walker Ranch, in that the water, forage, and grazing rights are essential to ranch operations, depriving the Walkers of all economically viable use thereof and all reasonable, investment-backed expectations (*see* Compl. ¶ 33); and the Walkers' preference grazing rights in the allotments (*see* Compl. ¶ 34). The 43 U.S.C. § 1752(g)

**9.** 43 U.S.C. § 1752(g) provides:

Whenever a permit or lease for grazing domestic livestock is cancelled in whole or in part, in order to devote the lands covered by the permit or lease to another public purpose, including disposal, the permittee or lessee shall receive from the United States a reasonable compensation for the adjusted value, to be determined by the Secretary concerned, of his in-

terest in authorized permanent improvements placed or constructed by the permittee or lessee on lands covered by such permit or lease, but not to exceed the fair market value of the terminated portion of the permittee's or lessee's interest therein. Except in cases of emergency, no permit or lease shall be cancelled under this subsection without two years' prior notification.

claim asserted that the Government's actions resulted in a *de facto* cancellation of the Walkers' grazing permits in order to dedicate the land to a different public use. *See* Compl. ¶¶ 35–38.

The Complaint also asked for the payment of damages in the following amounts: $1,000,000, for "temporary takings;" $2,000,000, for the taking of the Walker Ranch; $1,000,000, for the taking of the Walkers' cattle; $3,000,000, for the taking of water rights; $1,000,000, for the taking of grazing and forage allotments; and $2,000,000, for "costs and damages sustained as a proximate result of the Government's interference with the Walkers' ranching operations, including, but not limited to, fees for leasing other lands, feed costs, lost opportunity costs, lost profits, loss of goodwill, acquisitions of livestock, and other capital and non-capital expenses;" and interest. *See* Compl. ¶ 40.

On May 4, 2004, the Government filed a Motion to Dismiss. On August 16, 2004, the Walkers filed an Opposition, together with the Declaration of Ms. Shellie Walker in support thereof. On August 18, 2004, the Government filed a Reply.

On December 16, 2004, this case was reassigned to the undersigned judge.

## DISCUSSION

### A. Jurisdiction.

The Tucker Act, 28 U.S.C. § 1491(a)(1), authorizes the United States Court of Federal Claims to render judgment and money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract with the United States. *See United States v. Testan*, 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court, however, has held that the Tucker Act does not create any substantive right for monetary damages in *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d · 607 (1980). Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages in order for the court to have jurisdiction. *See Khan v. United States*, 201 F.3d 1375, 1377 (Fed. Cir.2000).

The United States Court of Federal Claims, however, has jurisdiction only if a complaint is filed within six years after a claim accrues. *See* 28 U.S.C. § 2501; *see also Forman v. United States*, 329 F.3d 837, 841 (Fed.Cir.2003) (quoting *Hart v. United States*, 910 F.2d 815, 817 (Fed.Cir.1990) ("The claim first accrues when all events have occurred that fix government liability and entitle the claimant to institute an action.")). Accordingly, the six-year statute of limitations is an express limitation on the Tucker Act's waiver of sovereign immunity. *See* 28 U.S.C. § 1491; *see also Hart*, 910 F.2d at 817 ("Exceptions cannot be engrafted on the statute of limitations so as to allow claims to be asserted beyond the six year time limit set forth in [26 U.S.C. § 2501.]"). The six-year statute of limitations on actions is a "jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed.Cir.1988); *see also Hair v. United States*, 350 F.3d 1253, 1260 (Fed. Cir.2003) ("The basic rule is that the clock of a statute of limitations begins to run from the date the plaintiff's cause of action 'accrues'[.]").

A claim asserted under the Just Compensation Clause of the United States Constitution "accrues when all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Boling v. United States*, 220 F.3d 1365, 1370 (Fed.Cir.2000). In an action for a taking of land, "the key date for accrual purposes is the date on which the ... land has been clearly and permanently taken." *Id.* Whether all relevant events have occurred is determined under an objective standard: "a plaintiff does not have to possess actual knowledge of all the relevant facts in order for a cause of action to accrue." *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed.Cir.1995) (quoting

*Menominee Tribe v. United States,* 726 F.2d 718, 721 (Fed.Cir.1984), *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984)).

**B.  Standard Of Review.**

In ruling on a motion to dismiss, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).  Plaintiff, as the non-moving party, however, bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question it [is] incumbent upon [plaintiff] to come forward with evidence establishing the court's jurisdiction."); *see also* RCFC 12(b)(1).

**C.  The Parties' Arguments.**

**1.  The Government's Argument.**

The Government asserts that the court does not have subject-matter jurisdiction over the Walkers' takings claims because the six-year statute of limitations began to run on November 8, 1996, the date the U.S. Forest Service issued a total cancellation of the Walkers' grazing permits. *See* Gov't Mot. to Dismiss at 1, 9–12.  On that date, the Government argues, the Walkers also were excluded from grazing on the allotments and thereby had actual knowledge of the alleged taking of their property, as evidenced by the Walkers' filing a Counterclaim in the United States District Court action. *Id.* at 11–12; *see also* Gov't Reply at 13–15.  Consequently, the Government argues that "the triggering event upon which all claims are predicated is the cancellation of the Walkers' term grazing permit.  Dismissal of all of the Walkers' claims for lack of jurisdiction is therefore [required]."  Gov't Mot. to Dismiss at 12 n. 8 (citing *Mitchell v. United States,* 41 Fed.Cl. 617 (1998)).

The Government also maintains that because the United States District Court ruled that the Walkers had no property rights on the allotments superior to those of the Government and that their continued grazing on the allotments after the grazing permit was cancelled on November 8, 1996 constituted a trespass, the Walkers are now precluded from arguing that access to and use of the allotments after that date was authorized. *See* Gov't Reply at 3–4.  In addition, the Government maintains that the Walkers' continuing trespass on the allotments did not toll the statute of limitations on their constitutional claim. *See* Gov't Reply at 3–4; *see also Mitchell,* 41 Fed.Cl. at 623 ("[I]t would be insupportable to toll the statute of limitations because of a continuing trespass by plaintiffs.").

In addition, the Government argues that the Walkers' Counterclaim in the United States District Court action did not toll the statute of limitations on their alleged takings claims during the time that the trespass suit was adjudicated. *See* Gov't Reply at 4–7; *see also Aulston v. United States,* 823 F.2d 510 (Fed.Cir.1987) (holding that a plaintiff's challenge of an agency action in a United States District Court depriving them of an alleged property interest did not toll the statute of limitations on a Just Compensation claim in the United States Court of Federal Claims arising from the same operative facts and ordering a stay pending adjudication of the agency action); *Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545 (Fed.Cir.1994) (holding that statute of limitations in a Just Compensation claim in the United States Court of Federal Claims was not tolled during the period a challenge to an agency action was pending before a United States District Court).

The Government also explains that the stabilization doctrine, as articulated in *Dickinson,* is limited only to cases involving a continuing series of physical events, similar to intermittent flooding or shoreline erosion. *See* Gov't Reply at 8–9.  Since the Walkers' alleged loss arose from a single event that terminated the Walkers' access to the allotments for grazing purposes, application of the stabilization doctrine is inapplicable. *Id.* at 9.  In the alternative, the Government relies on *Alder v. United States,* 785 F.2d 1004 (Fed.Cir.1986) (holding that a claim for Just

Compensation accrued when plaintiffs lost all grazing permits for the use of land accessed by road from fee land and discontinued all ranching operations) and *John R. Sand & Gravel Co. v. United States*, 57 Fed.Cl. 182 (2003) (holding that a claim for Just Compensation accrued when the Environmental Protection Agency issued an administrative order that required lessee to cease mining operations on portions of leased land) to support the position that a Just Compensation claim accrued on the date the grazing permit was cancelled. *See* Gov't Reply at 9–13. The Walkers clearly were aware of the facts giving rise to their Just Compensation claims, therefore, as a matter of law, the Complaint in the United States Court of Federal Claims is now barred by the six-year statute of limitations. *See* Gov't Reply at 13–15.

Finally, the Government argues that the Walkers' claim that the Government "has trespassed, is, and will continue to trespass on [the Walkers'] property" sounds in tort and should be dismissed for lack of subject matter jurisdiction. *See* Gov't Mot. to Dis. at 15; *see also* Compl. ¶¶ 25.I, 27.B. In addition, the Government maintains that the Walkers' claim that the Government "failed to give adequate notice before causing cattle to be removed from the Allotment" and acted otherwise unjustifiably in canceling the Walkers' grazing permits amounts to a claim for a violation of due process pursuant to the Fifth Amendment, or a claim for review of an agency action under the Administrative Procedures Act, 5 U.S.C. § 702 ("A person suffering legal wrong as a result of agency action . . . is entitled to judicial review there-

of."). *See* Gov't Mot. to Dis. at 15–16; *see also* Compl. ¶¶ 25.D, 25.F, 25.J, 25.L, 25.M, 27.C.

## 2. The Walkers' Argument.

The Walkers counter that their Just Compensation claims did not accrue until February 27, 1998, the date the United States District Court issued a Final Judgment dismissing the Walkers' Counterclaim or June 30, 1998, the date by which the United States District Court ultimately ordered the Walkers to remove livestock from the allotments: [10]

> [T]he crux of this case rests not on a claim for compensation for the cancellation of the grazing permit, but on the loss of Walkers' water rights, forage rights, grazing lands, and permanent improvements owned by the Walkers within the allotment. These property rights were not lost to the Walkers until, at the earliest, June 30, 1998, at which time the Walkers were enjoined by the [United States] District Court, at the urging of the Forest Service, from grazing their livestock on the Gila National Forest and were ordered to remove their cattle from National Forest Service lands. Up until that time, all events fixing the government's liability had not yet occurred, and the situation for purposes of evaluating a takings claim had not stabilized.

Pl. Opp. at 10.

In the alternative, the Walkers assert that under the "stabilization doctrine," a physical "takings claim does not accrue until the situation has stabilized, all events which fix the

---

**10.** The Walkers argue that their Just Compensation claims accrued either on February 27, 1998, the date of the entry of the United States District Court Final Judgment or June 30, 1998, the date the Walkers ceased grazing on the allotments. *See, e.g.,* Pl. Opp. at 9 ("The Walkers' Takings Claim Did Not Accrue For Purposes of Calculating the Statute of Limitations Until the Conclusion of the Trespass Lawsuit on February 27, 1998."); Pl. Opp. at 16 ("[T]he Walkers' takings claim did not accrue until the [United States] District Court issued its ruling in the trespass action.") Pl. Opp. at 17 ("Up until the date of [the United States District Court Order], the issue of whether the Walkers were in trespass was undecided and it was unclear whether the process would result in a permanent taking."); Pl.

Opp. at 1–2 ("[T]he statute of limitations began to accrue on June 30, 1998, the date on which the [United States] District Court enjoined the Walkers . . . from being able to use their state-based water rights. The injury to the Walkers occurred on June 30, 1998 and not before."); Pl. Opp. at 10 ("These property rights were not lost to the Walkers until, at the earliest, June 30, 1998 . . . ."); Pl. Opp. at 11 ("[T]he government's liability did not become fixed[] until the conclusion of the trespass lawsuit on June 30, 1998."); Pl. Opp. at 16 ("[T]he [United States] District Court enjoined the Walkers from grazing on the allotments [after] June 30, 1998 . . . . Accordingly, it was not until this date that the Walkers' taking[s] claim accrued.").

government's liability have occurred, and the plaintiff has become aware of their existence." Pl. Opp. at 11–12 (citing *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947)). Therefore, the United States Court of Federal Claims has jurisdiction over the claims asserted in the February 5, 2004 Complaint. In addition, relying on *Alder* and *John R. Sand & Gravel,* the Walkers argue that the situation did not stabilize and their property was not clearly and permanently taken until after the United States District Court issued the February 27, 1998 Final Judgment because they continued to graze an average 265 head of cattle on the allotments until June 30, 1998, the last date permitted. Therefore, the Walkers' Just Compensation claim did not arise until the date that they were physically deprived of access to their property. *See* Pl. Opp. at 17–19; *see also* Walker Decl. ¶ 32; Def. Ex. 2 (Engel Decl.) ¶ 16.

**D. The Court's Resolution Of The Government's Motion To Dismiss.**

**1. The Walkers' Claim For Compensation Under 43 U.S.C. § 1752(g) Is Barred By The Tucker Act Six–Year Statute Of Limitations.**

■ If the U.S. Forest Service cancels a permit or lease for grazing domestic livestock, in order to devote the lands covered by the permit or lease to another public purpose, the permittee will recover reasonable compensation from the Government. *See* 43 U.S.C. § 1752(g). Under the plain language of this statute, however, any claim arising thereunder is dependent upon the cancellation of the permit. On November 8, 1996, the U.S. Forest Service cancelled the Walkers' grazing permit. *See* Def. Ex. 17 at 51–52. Therefore, any cause of action the Walk-

ers had, based on the cancellation of the grazing permits, accrued on November 8, 1996, the date of cancellation. On that date, all events occurred to fix the Government's alleged liability and entitled the Walkers to bring an action for compensation. Since the Walkers' 43 U.S.C. § 1752(g) claim was not filed until February 5, 2004, more than seven years after the date on which the claim accrued, the United States Court of Federal Claims no longer has jurisdiction to adjudicate this claim.[11] *See* 28 U.S.C. § 2501 (requiring that claims must be filed in the United States Court of Federal Claims within six years from the date on which the claim accrued). Moreover, the facts here also are insufficient to warrant tolling the statute of limitations. *See Mapu v. Nicholson,* 397 F.3d 1375, 1379 (Fed.Cir.2005) (citing *Irwin v. Dept. of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)) (holding that equitable tolling in suits against the Government applies "where the claimant has actively pursued … judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass."). Accordingly, the Walkers' fourth cause of action, asserted in paragraphs 1–29 and 35–38 of the Complaint, for compensation pursuant to 43 U.S.C. § 1752(g), is dismissed.

**2. The United States District Court's Determination That The Walkers Had No Property Interest In The Allotments Is Now Final.**

■ Assuming *arguendo* that the court agreed with the Walkers that their Just Compensation claim did not arise until the United States District Court's Final Judgment was issued on February 27, 1998,[12] the

---

11. 43 U.S.C. § 1752(a) provides that grazing permits issued by the National Forest Service are subject to terms and conditions set forth by the Secretary of Agriculture and are cancelable for any violation of a grazing regulation or of any term or condition of the grazing permit. *Id.* The payment of grazing fees was required under the terms of the grazing permit. *See* Def. Ex. 1. The Walkers failed to pay grazing fees for the second half of 1996 as required under the terms of the grazing permit. *See* Def. Ex. 14 at 42. Therefore, assuming *arguendo* that the Walkers had

filed their 43 U.S.C. § 1752(g) claim in a timely manner, the Walkers would have had no standing to pursue relief under 43 U.S.C. § 1752(g) since they failed to make the required payments on Permit No. 06–1099.

12. The court is not satisfied with the Government's argument that, in the event the Walkers had a valid property interest on which to base Just Compensation claims, the cause of action accrued on November 8, 1996, the day the U.S. Forest Service cancelled the grazing permit.

Walkers no longer had a valid property interest in the allotments on that date, a necessary prerequisite to their Just Compensation claim.

The Fifth Amendment to the United States Constitution provides that "private property [will] not be taken for public use, without just compensation." U.S. CONST. amend. V, cl. 5. It is well settled that in order to bring a Just Compensation Claim under the Fifth Amendment, a plaintiff must have a valid interest in the property at issue at the time of the alleged taking. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed.Cir.2003) ("For any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken[.]"); *see also Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed.Cir.2001) ("the existence of a valid property interest is necessary in all takings claims.").

The United States Supreme Court has explained that the doctrine of *res judicata* encompasses both claim preclusion and issue preclusion. *See Carson v. Dept. of Energy*, 398 F.3d 1369, 1375 (Fed.Cir.2005) (citing *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 77, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)) (emphasis added) ("The preclusive effects of former adjudication ... are referred to collectively ... as the doctrine of *'res judicata.'* Res judicata is often analyzed further to consist of two preclusion concepts: 'issue preclusion' and 'claim preclusion.' "). Issue preclusion concerns the "effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided. This effect is also referred to as direct or collateral estoppel." *Carson*, 398 F.3d at 1375 (citations omitted); *see also Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (citations omitted) (emphasis added) ("A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and *res judicata*, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction

... cannot be disputed in a subsequent suit by the same parties or their privies.' "). Claim preclusion refers to the "effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit." *Carson*, 398 F.3d at 1375.

On January 7, 1998, the United States District Court held that "[t]here is no legal basis for [the Walkers'] argument that they hold title to the 'surface estate' of the Cold/Hot Springs allotment." Def. Ex. 21 at 87; *see also* Def. Ex. 22. That federal trial court also held that the Walkers had "no legal title to the Cold/Hot Springs allotment and that their continued grazing of cattle upon the Cold/Hot Springs allotment ... without a permit constitute[d] a trespass." Def. Ex. 21 at 87. In order for the Walkers to bring a claim based on the taking of the surface rights on the allotments, including water, forage, and access rights, the Walkers must first establish ownership of a property interest in the surface estate of the allotments at the time of the alleged taking. *See Cienega Gardens*, 331 F.3d at 1328. The legal issue as to whether the Walkers had such property rights in the allotments was put in issue and directly determined by the United States District Court. *See* Def. Ex. 21 at 87. If the Walkers wanted to challenge this legal determination, the proper action would have been filing a timely appeal in the United States Court of Appeals for the Tenth Circuit. The Walkers failed to file that appeal. Accordingly, as a matter of law,. the Walkers now are collaterally estopped from asserting their Just Compensation claims in the United States Court of Federal Claims, because the United States District Court's judgment that the Walkers did not have legal title to the allotments is now final and binding on this court.

Accordingly, the Walkers' first cause of action, paragraphs 1–32 of the Complaint, for compensation for the alleged taking of their interest in the allotments, is dismissed.

"[A] taking occurs when the owner is deprived of use of the property[.]" *Caldwell v. United States,* 391 F.3d 1226, 1235 (Fed.Cir.2004). The pleadings and supporting evidence indicate that the

Walkers continued to graze an average of 265 head of cattle on the allotments until June 30, 1998, the last date the United States District Court permitted them to do so.

### 3. The Walkers' Claim For An Alleged Taking Of All Economically Viable Use Of The Walker Ranch Survives The Government's Motion To Dismiss.

The Complaint in this court alleges a Just Compensation claim resulting from the alleged taking of "water, forage, and land [that] has deprived [the Walkers] of all economically viable use of the Ranch and has deprived [the Walkers] of their reasonable investment-backed expectations." Compl. ¶¶ 1–31, 33.A—33.E. The court has determined that these bare boned assertions are sufficient to withstand a motion to dismiss, however, the Walkers face a heavy burden of proof to establish that the Government's actions interfered with "reasonable investment-backed expectations" and rendered the Walker Ranch to have "no economically viable use." *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124–25, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) ("[The United States Supreme Court] has dismissed challenges to takings claims on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes."). Nevertheless, the second cause of action, paragraphs 1–31 and 33.A—33.E of the Complaint, survives the Government's Motion to Dismiss.

### 4. The Walkers Have No Property Interest In Grazing Permit No. 06–1099, Or Preference Grazing Rights.

The Complaint in this court also alleges a Just Compensation claim regarding the Walkers' grazing preference [13] in the allotments. *See* Compl. ¶¶ 1–31, 34. In *United States v. Fuller*, 409 U.S. 488, 493, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973), the United States Supreme Court considered whether the value added to fee land by grazing rights on neighboring permit land was compensable when the Government took the fee land through condemnation and held that "the Fifth Amendment does not require the Government to pay for that element of value based on the use of respondents' fee lands in combination with the Government's permit land." Likewise, in *Alves v. United States*, 133 F.3d 1454, 1457 (Fed.Cir.1998), the United States Court of Appeals for the Federal Circuit has explained:

> [T]he distinction between grazing 'permits' and grazing 'preferences' is irrelevant because neither constitutes a property interest compensable under the Fifth Amendment.... Implicit in *Fuller* is the notion that grazing preferences that are attached to fee simple property are not compensable property interests under the Fifth Amendment. What is compensable is the fee interest only, divorced from other governmentally-created rights or privileges appurtenant to the fee. Thus, the distinction between [a] grazing preference and [a] grazing permit is irrelevant from a Fifth Amendment perspective, and neither constitutes a compensable property interest.

*See also Wyatt*, 271 F.3d at 1097 ("[T]he existence and initiation of permit proceedings does not itself constitute a taking. Indeed, government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). Accordingly, the Walkers' third cause of action, paragraphs 1–31 and 34 of the Complaint, for compensation for the alleged taking of Permit No. 06–199, is dismissed.

### 5. The Walkers Do Not Assert A Tort Claim, A Claim For A Violation Of Due Process, Or A Claim For Review Of An Agency Action In The February 5, 2004 Complaint.

The Walkers concede that the United States Court of Federal Claims does not have jurisdiction to adjudicate tort claims and that the Government's purported "trespass" onto the Walkers' property is merely a fact supporting their Just Compensation argument rather than a separate cause of action for trespass. *See* Pl. Opp. at 27. Moreover, the Walkers state that the assertion of

---

**13.** A "grazing preference" is a "superior or priority position against others for the purpose of receiving a grazing permit or lease. This priority is attached to base property owned or controlled by the permittee or lessee." 43 C.F.R. § 4100.0–5.

lack of adequate notice also was "merely an assertion of fact" in support of their Just Compensation claim and not a separately stated cause of action. *See* Pl. Opp. at 28. Because the Walkers concede that they intended the statements in paragraphs 25.D, 25.F, 25.I, 25.J, 25.L, 25.M and 27.C of the Complaint to be mere factual assertions in support of their Just Compensation and 43 U.S.C. § 1752(g) claims, the Complaint does not state a separate tort claim or claim for a review of an agency decision under 5 U.S.C. § 702.

### CONCLUSION

For the foregoing reasons, the Government's May 4, 2004 Motion to Dismiss is granted in part and denied in part. The Court will arrange a scheduling conference to set the second cause of action, paragraphs 1–31 and 33 of the Complaint, for trial, if the Walkers wish to proceed.

**IT IS SO ORDERED.**